# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# COLUMBIA DIVISION

| | |
|---|---|
| **JOHN DOE,** | Civil Action No. _____ |
| **Plaintiff,** | |
| -against- | **COMPLAINT** |
| **UNIVERSITY OF SOUTH CAROLINA, HARRIS PASTIDES, individually and as agent for University of South Carolina, ALISA LIGGETT, individually and as agent for University of South Carolina, CARL WELLS, individually and as agent for University of South Carolina, DENNIS PRUITT, individually and as agent for University of South Carolina.** | **(Jury Trial Demanded)** |
| **Defendants.** | |

RECEIVED
USDC CLERK, COLUMBIA, SC
2018 JAN 19  PM 3: 58

Plaintiff John Doe[1], (hereinafter referred to as "Plaintiff" or "John Doe"), pursing

this case *pro se*, as and for his Complaint, respectfully alleges as follows:

### Verified Complaint

This case arises out of the actions taken and procedures employed by Defendants

University of South Carolina ("USC"), Harris Pastides ("Defendant Pastides"), Alissa Liggett

("Defendant Liggett"), Carl Wells ("Defendant Wells"), Dennis Pruitt ("Defendant Pruitt"),

---

[1] Plaintiff herewith files a motion to proceed pseudonymously.

(collectively, "Defendants") concerning allegations made against Plaintiff, a male international graduate student at USC as a result of false allegations of nonconsensual sexual activity with fellow USC student Jane Roe whose accusative personality and lack of credibility became known and proven to the USC's officials during this process. Plaintiff is facing deportation as a result of suspension from school and he has lost his education, employment, and livelihood in the U.S.

1.      The allegations involving Jane Roe purportedly refer to what was clearly consensual sexual activity that occurred on the evening of March 23, 2017 (the "Incident")

2.      Plaintiff and Jane Roe met through an online dating app, Tinder, one week prior to the Incident on March 16, 2017.

3.      Upon talking and getting to know each other on Tinder, Plaintiff and Jane Roe became very interested in meeting each other. Therefore, they set a date for the following Thursday March 23, 2017 (the night of Incident).

4.      In the time between March 16, 2017 and March 23, 2017, Plaintiff and Jane Roe exchanged text messages every night and mutually sent each other sexually explicit messages and talked about how much they are attracted to become intimate with one another.

5.      On March 23, 2017, around 6 pm, Plaintiff and Jane Roe met in a restaurant on Main street called "Olive Garden".

6.      Plaintiff did not have his car at that time, so he drove his moped to the Restaurant to meet Jane Roe. He was planning on going to his place of employment to perform research for his projects after meeting Jane Roe since Plaintiff's place of employment was also located on Main Street.

7.    Upon meeting each other for the first time, they enjoyed their time together and spent around 1.5 hours in that restaurant.

8.    During the course of dinner, Plaintiff and Jane Roe exchanged ideas about movies and TV shows they usually watch on NETFLIX.

9.    After finishing dinner, Plaintiff and Jane Roe decided to watch a movie together at Plaintiff's house.

10.    Jane Roe offered that they can go to Plaintiff's house with her car and she can drive them to his house.

11.    Jane Roe drove herself and Plaintiff to his house and parked her car besides Plaintiff's roommate's car which was parked in the parking of his house.

12.    When they both went to Plaintiff's room, after few minutes of watching a movie, they started kissing each other and making out.

13.    They were mutually interested in kissing each other, and Plaintiff did not believe there was any sign of uncomfortableness by Jane Roe.

14.    After they started kissing each other for a few minutes, they started to touch each other's body parts in an intimate way.

15.    During the course of their interaction, Jane Roe told Plaintiff that she does not want to have sex on their first date. Plaintiff acknowledged what Roe said and immediately stopped kissing her and touching her body.

16.    A few minutes after that, Jane Roe started kissing Plaintiff again but this time in a more sexual manner and she started to firmly pull him closer to her body and started to touch plaintiffs body parts while making enjoyment noises.

17.    Plaintiff was surprised by Roe's behavior since minutes earlier she mentioned she does not want to engage in sexual activities, but all those actions were clearly sexual and intimate.

18.    After Jane Roe initiated the sexual activity, Plaintiff became confident that Roe has changed her mind and she wants to become intimate.

19.    In response to Jane Roe's actions, Plaintiff also started kissing her and started to touch her body parts.

20.    As Plaintiff was touching Roe's intimate body parts, Roe pulled Plaintiff firmly closer to her own body and expressed her satisfaction by making louder sexual noises.

21.    During the course of that night, Jane Roe and Plaintiff engaged in sexual activities which were initiated by Jane Roe.

22.    During that night, Plaintiff intimately inserted his fingers in Roe's vaginal area which was a welcome activity and was followed by an oral sex from Jane Roe on Plaintiff which took around 1-2 minutes.

23.    After 1-2 minutes of performing Oral Sex on Plaintiff, Jane Roe stopped and looked at Plaintiff and said that she has to leave and started to put her clothes on.

24.    Plaintiff was shocked and asked her why she is leaving and if he did anything that bothered her.

25.    Jane Roe responded that this was not a good idea and she left his house.

26.     Jane Roe had previously told Plaintiff that she had only two sexual encounters in her life.

27.     When Jane Roe left Plaintiff's house, Plaintiff texted her and asked "I'm sorry what happened? Why did you leave? I thought you are having a good time?". Roe replied: "No, I am not having a good time, but I did not want to hurt your feelings"

28.     Jane Roe and Plaintiff did not have any contacts with each other after that night.

29.     Plaintiff moved on from that night and never contacted Jane Roe in any manner.

30.     After that night, Plaintiff deleted all the text messages they had from his phone and also deleted the Tinder app.

31.     On August 22, 2017, six months later, Roe filed a complaint to the Equal Opportunity Programs (hereafter "EOP") office accusing plaintiff of Sexual Assault, Involuntarily Restraint, and Dangerous Behavior in his house.

   a) Roe claimed that she sent a report about this incident in March back when it happened. However, she claimed no one ever followed up with her.

   b) In her complaint, Roe pictured Plaintiff as a sexual predator who horribly raped and assaulted her that evening when they were both in Plaintiff's house.

   c) Roe claimed that Plaintiff was asking for a ride home on the night of Incident and upon arrival he asked Roe to go to his house to watch a movie.

   d) Roe alleged that upon entering Plaintiff's room, he started to kiss her, "shoved his tongue" into her mouth and started to bite her lips.

e)  Roe alleged that Plaintiff started to pin her down on his bed and told her "I won't let you leave"

f)  Roe alleged that after all these actions performed by Plaintiff, she decided to leave his house but Plaintiff asked/begged/convinced her to stay.

g)  Roe claimed that after all those actions that she alleged Plaintiff had performed she "gave him the benefit of the doubt because I thought the weirdness is due to the cultural difference" and stayed in Plaintiff's house.

h)  Roe alleged that Plaintiff forcefully undressed her despite she was saying no and stop

i)  Roe alleged that Plaintiff forcefully inserted his fingers into her vagina which caused her a lot of pain and bleeding

j)  Roe alleged that Plaintiff grabbed her head and forced her to give him oral sex

k)  Roe claimed that she bit down on Plaintiff's penis which made him pull away in pain and by doing so she bought herself time to run away from Plaintiff's house.

l)  Roe falsely accused Plaintiff of the most horrible actions in her complaint.

m) During the whole process of investigation, Plaintiff never had access to the original complaint supposedly submitted in March 2017.

n)  Plaintiff became notified of the complaint through email by EOP investigator Kevin Sheppard (hereafter "Sheppard") stating that EOP will be conducting an impartial investigation of this complaint.

o) On August 23, 2017 at 11:17:18 am, according to the complaint letter, Defendant Wells last modified the complaint which was originally submitted on August 22, 2017 at 10:31:32 pm by Jane Roe.

p) Plaintiff never had access to the original complaint and he was only shown the version that was modified by Defendant Wells throughout the whole process.

q) Neither Defendant Wells nor Sheppard ever explained to Plaintiff about the reason the complaint was modified by Defendant Wells.

32.     On August 23, 2017, Plaintiff received a no contact order from EOP stating that he should not contact Roe.

33.     On August 24, 2017, Plaintiff received a letter from Sheppard stating that:

"Please contact this office within five (5) working days (by August 30, 2017) to arrange an appointment to fully discuss the charges as alleged AND to submit your written response"

34.     On August 24, 2017, Plaintiff received a letter from OSC stating that:

"The Student Conduct Office has received information related to your conduct on March 26, 2017 and August 24, 2017 that has caused concern about you and your presence on the University of South Carolina campus. This initial report regarding allegations of interpersonal violence has given us reason to believe your continued presence could be potentially threatening, harmful, or dangerous to others or the university community and/or may interfere with the orderly operation of the institution. Therefore, you are immediately restricted from the University of South Carolina until further notice from the Office of Student Conduct. During this Interim Restriction period, you are only allowed to be on campus in the following

buildings: Jones Physical Science Building, and Graduate Science Research Building"

35.    On August 24, 2017, after meeting with Sheppard, Plaintiff submitted his response to the Complaint through email to him stating that those allegations are false and the complaint is filled with inaccuracies and exaggerations

36.    Plaintiff was never told he has the right to have an attorney during the whole process in order to avoid self-incrimination.

37.    After Plaintiff submitted his response to Roe's complaint, Sheppard met with Roe and she submitted a response to Plaintiff's reply.

38.    On September 14, 2017, Defendant Sheppard sent Plaintiff a Letter of Determination regarding that case and found him responsible for "Non-consensual Sexual Touching/Penetration" but not responsible for "Stalking" and involuntary restraint. (Exhibit E)

39.    On September 19, 2017, Office of Student Conduct's (hereafter "OSC") Director of Academic Integrity Erin Kitchell (hereafter "Kitchell") sent a letter to Plaintiff notifying him that a hearing has been scheduled for him on October 13, 2017 at 9:00 am. And according to the University Policy, a panel of three undergraduate students (a group of 3 undergraduate students between 19 to 22 years of age) and two faculty/staff members are going to decide whether a violation of University Policy has occurred.

40.    On September 14, 2017, prior to the hearing, Sheppard sent a letter to Plaintiff's immediate supervisors, Dr. Richard Adams and Dr. Daniel Freeman, and attached his letter of determination stating that:

> "This correspondence is being sent to you in regards to an investigation that was just completed in the Office of Equal Opportunity Programs involving one of your

students, Mr. John Doe. Attached, you will find a copy of our Letter of Determination that was issued to Mr. Doe regarding the allegations that were brought against him."

41.    On October 5, 2017, Plaintiff received a letter from OSC stating that Roe has submitted her medical records to OSC office that will be added to his hearing packet. Additionally, Roe made the decision to not participate in the hearing scheduled on October 13, 2017.

42.    In her complaint letter, Roe claimed that she was bleeding for 2-3 days, had bruises and tears along with redness and irritation on her vaginal area.

43.    On the other hand, according to Roe's OBGYN doctor, there was no evidence of any tears or bruises on her vaginal area and it looked normal for her age.

44.    Roe's doctor's observation of her vagina completely contradicted her accusations.

45.    Plaintiff found it necessary to ask Roe's OBGYN doctor to be a witness in the hearing which was scheduled for Oct 13, 2017 so the doctor could explain to the hearing panel about his observations and be able to answer questions of the hearing panel.

46.    On Monday October 9th, 2017, Plaintiff visited Roe's OBGYN doctor's office in Palmetto Health Baptist hospital.

47.    During that visit, Plaintiff was very polite and respectful to the doctor's staff and simply requested to meet with the doctor.

48.    Upon talking to the doctor, Plaintiff told Dr. Stands that he is not by any means interested in seeing Jane Roe's medical records and he does not expect her doctor to show him any of her medical records.

49.    Dr. Stands told Plaintiff that there needs to be a request form the authorities so he can come to the hearing.

50.    Plaintiff found out later that University officials do not have such authority to subpoena a doctor to a hearing.

51.    Around 12 pm on that day, Plaintiff left Dr. Stands' office and headed to his place of employment on Main street on his moped.

52.    On his way back to his office, Plaintiff incidentally saw Jane Roe exactly in front of his place of employment since she was walking up Main street in the opposite direction.

53.    After realizing that the girl is Jane Roe, Plaintiff left the area immediately and parked his moped behind the building and entered his place of employment.

54.    On October 13, 2017, Plaintiff attended the hearing at OSC office and Jane Roe did not attend the hearing.

55.    As a result of the hearing on October 13, 2017:

   a) Plaintiff was found Responsible for "Non-Consensual Sexual Penetration" but not Responsible for "Non-Consensual Sexual Touching" and "Dangerous Behaviors-Intimidation, Coercion, Abuse" by the hearing panel.

   b) The rationale of the hearing panel was that it was non-contested by all parties that the he did not receive "verbal consent" to penetrate Roe's vaginal area. And

due to insufficient information, the panel were not able to find Doe responsible for offensive touching and Dangerous Behavior.

c) In regards to the sanctions the panel decided on Restriction from all campus areas except Doe's workplace, Conduct Probation, Good Life Program, No Contact Order, and First Right of Refusal which were intended to be educative in nature and also put protective measures in place regarding the Roe's safety.

d) Doe later found out that the hearing panel decided not to suspend the him because they felt suspending him as an international student would be punitive punishment, and because they felt suspending him would not allow for knowledge and growth due to his Visa status. (Appendix M)

e) In the hearing on October 13, 2017, Roe called Doe a "dangerous man for this society" in her Impact statement and brought up new charges and allegations against him such as stalking her on main street and following her on the streets at night and asked for Plaintiff's expulsion which was read by Kitchell. (The hearing was recorded)

56.     After the hearing, Plaintiff received a letter from OSC with a summary of the hearing which stated that both students have five university business days from the date the decision letter is sent to submit a written request for an appeal. After the five days, the appeal(s) will be sent to a Title IX Appellate review panel for consideration at which time all appeal opportunities are closed.

57.     It is also stated in the OSC's website that:

"Appeals must be submitted within five business days of the hearing date"

And,

> "After the five days, the appeal(s) will be sent to the vice president for student affairs and academic support for consideration at which time all appeal opportunities are closed"

58. Five business days after the hearing, October 20, 2017 was the last day both parties could appeal the decision of the hearing panel.

59. None of the parties appealed the decision of the hearing panel during the five business days after the hearing.

60. On October 24, 2017, Roe filed an appeal after 7 business days, 2 days later than the allowed time and claimed that "The original conduct administrator/council committed a procedural error in the case which significantly prejudiced the findings" (Appendix J)

61. In her appeal letter, Jane Roe stated that

> a) Kitchell was negligent in representing her and thereby denied her the opportunity for relief granted by the University's Title IX protocol and the ability to present a comprehensive and accurate account of her assault and harassment to the panel

> b) Kitchell showed unfair deference to the respondent and failed to represent her to the best of her ability,

> c) Kitchell altered and omitted testimony from her impact statement before presenting it to the panel, without her knowledge or consent.

> d) The omitted information was highly probative for her case, and its omission weakened her case irreparably.

e) Kitchell had reason to know she was negligent in representing her

f) Kitchell told her that she had a "strong case" for "Offensive Touching", but the panel found John Doe "Not Responsible" due to a "lack of evidence"

g) Kitchell mislead her by telling her that she was her representative

h) Kitchell convinced her to not attend the hearing

i) She has heard from various sources that Plaintiff's academic situation was the main reason he was not suspended and according to the department of education, respondent's academic situation should not be considered.

i) Jane Roe demanded a new hearing.

62.    On October 24, 2017, Plaintiff was informed by OSC that Roe has filed an appeal after 7 business days and that they are also giving him 7 business days to appeal.

63.    On October 25, 2017, Plaintiff filed a cross appeal to the Complainant's appeal, and mentioned that the appeal was filed too late which is against the policy, and that Kitchell did not take his side in the hearing, and Roe was again lying and making false accusations.

64.    On November 9, 2017, the title IX committee reviewed all the appeals and notified all parties of their determination and deliberated that:

"The Office of Student Conduct states that the Carolina Judicial Council was instructed not to consider the academic status of the respondent when determining sanctions. The rationale indicates that the academic status/visa status was considered"

And,

"The Committee has determined a new panel of Carolina Judicial Council members will be required to rehear this case. In addition, the new panel will need to ensure their decision is not primarily determined due to the respondent's visa status"

65. The university policy about the appeals states that:

"An appeal may be made for the following reasons:

- procedural error was committed that has significantly prejudiced the findings of the hearing council

- new evidence that could not have been available at the time of the hearing and would have a significant effect on the outcome of the case is now available"

66. According to the university policy, a procedural error should significantly prejudice the "findings" of the hearing council for the appeal to be accepted. It fails to provide anything about the sanctions, yet the Title IX committee considered the fact that Doe was not suspended due to his visa status a procedural error, and demanded a new hearing for this case.

67. Title IX committee failed to understand that according to the policy, a procedural error has to significantly prejudice the "findings" of the hearing to be considered as such.

68. Basic fairness is only achieved when the effect of the sanction on a person's life is considered when it is being determined. The fact that Plaintiff's visa status was considered in determining his sanction can by no means constitute a procedural error.

69. By requesting a new hearing on the case and telling the new hearing panel that they should not consider Plaintiff's visa/academic status, the Title IX Committee indirectly told the new hearing panel to find Plaintiff responsible and suspend him.

70.    Title IX committee basically followed the request of Jane Roe for a new hearing and used the visa/academic situation of Plaintiff as their rationale.

71.    According to the Department of Education's Question & Answer Letter to the Universities on September 22nd, 2017:

> "The Sanctions must be in a way that enforces the University Policy the best and consider the effect of separating a student from her or his educational institution"

72.    On November 9, 2017, the same day, less than 1 hour after Plaintiff received the determination of Title IX committee, he was notified by OSC that a new hearing was scheduled for him on December 14th, 2017 by the OSC.

73.    When Plaintiff became notified that Roe's appeal has been filed too late, he goes to OSC and speaks with Defendant Liggett. Liggett told him that

> "We are also giving you 7 business days to appeal since hers was submitted 2 business days late. Once you appeal, we will submit a letter too, and all these 3 letters including Roes' appeal, your appeal and our letter will go to the Title IX committee for determination."

74.    When Plaintiff complained to Defendant Liggett about the fact that Roe's appeal has been filed too late and it should not have been accepted, she mentioned that "I also did not agree with that decision".

75.    Considering Defendant Liggett is the Executive Director of Office of Student Conduct, she is responsible for all the decisions made regarding the hearings and she is the one who had to decide whether the appeal had to be accepted or not.

76.     As Defendant Liggett mentioned earlier to Plaintiff, she also had to submit a letter regarding the appeals before forwarding them to the Title IX Panel Review Committee.

77.     Liggett had a crucial role in the acceptance of Roe's appeal which was filed too late.

78.     When Plaintiff complained about the decision of the panel about the rehearing to EOP investigator Kevin Sheppard, he asked Plaintiff if he has objected the fact that appeal was filed too late. Doe sent him his appeal letter in which he clearly and respectfully stated that "The appeal was filed too late which is against the policy". Sheppard never replied to Doe's email and never followed back with him.

79.     When Plaintiff reminded Sheppard that suspension is equal to expulsion for him and considering the recommendation of Title IX Committee the panel was not to consider Plaintiff's academic/visa status, he said that "well this is how it is, a student gets suspended every once in a while"

80.     On November 16, 2017, Plaintiff was notified that additional documents are being added to the hearing scheduled on December 14, 2017.

81.     On November 21, 2017, Plaintiff was notified that Roe has filed another complaint against him which were later added to the same hearing scheduled on December 14th, 2017 instead of being discussed in a separate hearing.

a) Jane Roe again made false accusations against Plaintiff in her complaint.

b) Roe claimed that Plaintiff visited Dr. Stands office to seek her medical records from her doctor

c) Roe claimed that Plaintiff harassed people and staff during his visit to Dr. Stands office

d)  Roe claimed that Plaintiff attempted to seek her medical records from Dr. Stands and he had to argue with Plaintiff that he would not give them to him.

e)  Roe claimed that other doctors were behind Dr. Stands office because the argument of Plaintiff and Dr. Stands was too loud

f)  Roe claimed that Plaintiff placed different phone calls to Dr. Stands office to seek her medical records

g)  Roe claimed that Plaintiff impersonated himself as being OSC office manager and called Dr. Stands office to seek her medical records

h)  Roe claimed that Plaintiff asked a lady to call Dr. Stands office and impersonate herself as her mother and seek her medical records

i)  Roe claimed that the day she saw Plaintiff in front of his place of employment on Main street, Plaintiff was stalking and harassing her and has violated the no-contact order.

j)  Roe claimed that Plaintiff was following her car one night on different streets.

k)  Roe made false police reports about those allegations to the Columbia Police Department and USC Police Department

l)  Plaintiff was never contacted by the Police regarding those matters

m)  Roe called Doe a "Narcistic Sociopath" and a "Criminal" in her complaint, and requested his expulsion from USC.

n)  Roe requested a restraining order from the magistrate judge against Plaintiff

82.  Upon reading those false accusations and the police reports, Plaintiff got really shocked and stressed and harassed.

83.  Plaintiff was asked to respond to those allegations the same way he responded to Jane Roe's original allegations.

84.    On November 22, 2017, Plaintiff filed a complaint against Roe to the EOP and asked EOP to stop her from falsely accusing him and pointed out that all those false accusations are becoming overwhelming for him and causing him mental and emotional distress.

85.    In his complaint against Roe, Plaintiff showed the GPS markings of the location where Roe was accusing him of stalking and harassment and also denied all the allegations related to his visit at Dr. Stands office. Plaintiff also denied that the phone calls were allegedly placed on his behalf to the Dr. Stands office.

86.    On December 1, 2017, Wells dismissed Plaintiff's complaint and said no policy violation has been occurred by Roe.

87.    On December 5, 2017, Plaintiff was notified that he was found "not responsible" for the allegations made by Roe.

88.    Sheppard met with Dr. Stands in person and asked him if those allegations against Plaintiff were true.

89.    Dr. Stands denied the fact that Plaintiff was seeking Roe's medical records. The Doctor also denied the fact that Plaintiff was behind those suspicious phone calls made to his office.

90.    Dr. Stands stated that Plaintiff was extremely courteous and cordial during his interactions with him and the fact that no one in his office were disturbed or annoyed by his presence there.

91.    In addition, the allegations of stalking and harassment were allegedly occurred exactly in front of Plaintiff's place of employment which Plaintiff had a good reason to be there.

92.    On December 5, 2017, Plaintiff sent a letter to Liggett, and asked for postponement of the hearing because of the new allegations and the fact that they were going to be discussed in the same hearing.

93.    Plaintiff also had deadlines at work and other graduate school responsibilities and the fact that Roe had requested a Restraining Order against him have added tremendous amount of stress against him.

94.    The hearing for the restraining order request at magistrate court was originally scheduled on December 13th, 2017, only one day before the USC hearing.

95.    On December 8, 2017, Plaintiff's request was denied by Defendant Liggett and he respected that decision

96.    On December 13, 2017, both parties attended the hearing at the OSC,

   a) In the hearing, Sheppard did not testify about the allegations and his investigations the same way he testified in the original hearing on October 13, 2017 where Roe was absent.

   b) Jane Roe brought up new allegations against Plaintiff and mentioned that the oral sex she gave Plaintiff was also non-consensual.

   c) Sheppard confirmed the new allegations against Plaintiff in the hearing and said: "the oral sex that occurred later that night was not consensual either"

   d) That was the first time Doe was hearing about that allegation, he was not prepared to defend himself against it, and Sheppard did not talk about it in his investigation during the process

e) Sheppard did not talk about Plaintiff's cooperation, honesty, respectfulness, and compliance in the new hearing although he did emphasize that in the original hearing where Roe was absent

f) Sheppard was taking Roe's side in answering all of plaintiff, the Hearing Officers, and the Panel's questions and did not have a fair and just testimony of his investigations

g) Roe refused to answer 95% of Plaintiff's questions and in most of the rest of the 5% she responded with "You Raped Me!"

h) University representatives failed to make Roe answer Plaintiff's questions so that the hearing panel could reach a fair and informative decision

i) Plaintiff could not confront his accuser and he was deprived of the right to cross-examine her.

j) In her Impact Statement, Jane Roe, disclosed Plaintiff's confidential records about another disciplinary case with OSC which was about his text messages to another girl which were inappropriate which Plaintiff took responsibility for, and apologized to that person, and the case was confidentially resolved.

k) According to the university policy, respondent's confidential records cannot be disclosed to the hearing panel by any person other than the university officials.

l) Even when it is disclosed, the details are still confidential but the panel has to become aware of the nature of the disciplinary action.

m) Plaintiff was denied the right to read Roe's previous appeal statement in which she verbally attacked Kitchell and accused her of convincing her not to attend the hearing to the hearing panel.

n) That appeal letter could serve as a testimony in the hearing proving Roe's lack of credibility and accusative personality.

o) The hearing panel found Plaintiff responsible for all the allegations of "Non-Consensual Sexual Penetration", "Non-Consensual Sexual Touching", "Dangerous Behaviors-Abuse, Intimidation, Coercion" and not responsible for "Failure to Comply by university policies"

p) Plaintiff showed good faith by telling the panel that he is willing to terminate his Ph.D. studies by requesting a master's degree and applying to another school and leave the university so that him and Jane Roe would be as far as they could and do not have any form of contact with one another.

q) Since most universities offer admission for the Fall semester, Plaintiff needed one more semester to finish up his work, request his master's degree and apply to other universities.

r) Plaintiff voluntarily offered the hearing panel that OSC can put a hold on his registration for any semester after Spring 2018.

s) The hearing panel suspended Plaintiff for 2.5 years from university starting Monday December 18, 2017 which is equal to expulsion from the university and the U.S. for him due to his visa status.

t) The panel knew that this suspension will lead in the expiration of his visa status, and Plaintiff can never go back to USC and America and will have to

go back to his home Country with no accomplishments after three years of research, teaching, and studying.

u) Due to the recent unrest his home Country, Iran is not a safe place for Plaintiff to be.

v) In their rationale for their decision, the hearing panel ignored all Doe's testimonies, evidence, proofs, and arguments, and also ignored EOP investigator's testimony and investigation that there is no evidence finding of dangerous/stalking behavior. The hearing panel quoted all Roe's accusations as their rationale.

97.     On December 21, 2017, Doe appealed the decision of the hearing panel in a timely and respectful manner and pointed out all the procedural errors and unfairness during the process before, during, and after the hearing.

98.     On January 17, 2018, Doe was notified that USC is upholding its decision about the hearing and suspension is in place, and Director of International Student Services, Jody Pritt was notified.

99.     John Doe has sustained tremendous damages to his future education and career prospects as a result of the Decision and Sanction.

100.    Plaintiff even contemplated suicide after he was suspended for 2.5 years from USC and was facing deportation.

101.    As is mentioned in the Prayer for Relief section of this complaint, Plaintiff is demanding this court to enjoin Defendants from enforcing USC's disciplinary suspension and other disciplinary sanctions  imposed upon him in the hearing on December 14, 2017.

102.    Throughout the investigative process, Defendants failed to abide by USC's own guidelines and regulations and acted in direct violation of constitutional, federal and/or state laws.

103.    A non-exhaustive list of Defendant's wrongful actions include the following:

(i) Defendants failed to abide by USC's administrative policy and have violated the due process;

(ii) Defendants made an erroneous and arbitrary decision in suspending Plaintiff for 2.5 years;

(iii) Defendants evidenced a gender bias against Plaintiff as the male accused throughout the investigative and hearing process;

(iv) Defendants made assessments of credibility and evidentiary weight with respect to Jane Roe without any rationale although her lack of credibility was evidenced by her false claims;

(v) Defendants failed to afford John Doe the requisite presumption of innocence required by a preponderance of the evidence standard;

(vi) Defendants showed unfair deference to Jane Roe and discriminated against Plaintiff by accepting Roe's appeal although it was submitted after the deadline;

(vii) Defendants showed unfair deference towards Jane Roe and discriminated against Plaintiff by scheduling a rehearing and suspending Plaintiff as Roe demanded in her appeal letter.

(viii) Defendants failed to properly address whether Jane Roe's allegations against Kitchell were true or not.

(ix) Defendants discriminated against Plaintiff by dismissing his complaint against Jane Roe without any legitimate rationale

(x) Defendants discriminated against Plaintiff by not treating him equally as a USC student when he filed a complaint

(xi) Defendants have violated USC's administrative policy and the due process by considering Plaintiff's original sanction a procedural error due to his visa status;

(xii) Defendants have violated the due process by trying Plaintiff twice for the same charges and therefore ignored his fifth amendment rights and committed double jeopardy;

(xiii) The unwarranted Sanction was unilateral and arbitrary, all of which demonstrated substantial procedural errors in violations of Title IX, the Fourteenth Amendment, the Fifth Amendment and other federal and/or state laws.

(xiv) Defendants failed to follow Department of Education's new guidelines published on September 22, 2017.

(xv) Defendants have discriminated against Plaintiff because of his sex and nationality.

104.    When Defendants subjected John Doe to disciplinary action, they did so in an arbitrary and capricious way, and in discrimination against him on the basis of his male sex. Defendants failed to adhere to USC's own guidelines and regulations, and the guidelines and regulations themselves are inherently discriminatory and insufficient to protect the rights of male students. The Decision reached was discriminatory; given the evidence (or lack thereof), a discriminatory bias against males and the underlying motive to protect USC's reputation and financial wellbeing was required for a conclusion of sexual misconduct and Doe's suspension to be reached.

105.    Plaintiff has been greatly damaged by the actions of Defendants: his education and career prospects have been severely compromised as he will be unable to gain admission other graduate schools or obtain employment with a disciplinary mark on his academic record.

106.    Plaintiff is facing deportation as a result of suspension inflicted on him by Defendants. Additionally, as a result of Defendants' actions and inactions, John Doe has suffered physical, psychological, emotional and reputational damages, economic injuries and the loss of educational and career opportunities.

107.    John Doe therefore brings this action to obtain relief based on causes of action for, among other things, violation of Title IX of the Education Amendments of 1972, violation of the 14th Amendment Procedural Due Process, violation of 5th Amendment Double Jeopardy, breach of contract and other state law causes of action.

## THE PARTIES

108.    Plaintiff is an international graduate student at USC, citizen of Iran and resident of the State of South Carolina. During the events described herein, Plaintiff was a student and employee at USC and resided off-campus in Columbia, South Carolina.

109.    Upon information and belief, USC is a public university located in Columbia, South Carolina.

110.    Upon information and belief, Defendant Pastides is a resident of the State of South Carolina and was the President of USC at all relevant times herein. Upon information and belief, Dennis Pruitt is a resident of the State of South Carolina and was Vice President for Student Affairs, Vice Provost and Dean of Students at USC at all relevant times herein.

111.    Upon information and belief, Defendant Wells is the Assistant Director of the Office of Equal Opportunity Programs and Deputy Title IX Coordinator at USC and is a resident of the State of South Carolina.

112.    Upon information and belief, Defendant Alissa Liggett is a resident of the State of South Carolina and was Executive Director of Office of Student Conduct at USC at all

relevant times herein.

113.    John Doe and Defendants USC, Pastides, Pruitt, Gist, Wells, Sheppard, and Liggett are sometimes hereinafter collectively referred to as the "Parties."

## JURISDICTION AND VENUE

114.    This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because:

(i) the federal law claims arise under the constitution and statutes of the United States; and

(ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

115.    This Court has personal jurisdiction over Defendant USC on the grounds that it is conducting business within the State of South Carolina.

116.    This Court has personal jurisdiction over Defendant Pastides on the grounds that he was acting as an agent of USC at all relevant times herein.

117.    This Court has personal jurisdiction over Defendant Pruitt on the grounds that he was acting as an agent of USC at all relevant times herein.

118.    This Court has personal jurisdiction over Defendant Wells on the grounds that he was acting as an agent of USC at all relevant times herein.

119.    This Court has personal jurisdiction over Defendant Liggett on the grounds that she was acting as an agent of USC at all relevant times herein.

120.    Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because USC is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.   Agreements, Representations, Covenants &

### Warranties Between Plaintiff and USC

121.    Plaintiff, John Doe, is a fourth year Ph.D. candidate at the University of South Carolina, and he has three more semesters to obtain his Ph.D. from this institution.

122.    Plaintiff is also employed by the University of South Carolina Chemistry Department as a Teaching Assistant/Research Assistant which requires him to regularly teach and perform research as part of his employment and matriculation at the University.

123.    Plaintiff is a citizen of Iran, and currently resides in Columbia, South Carolina on a student F-1 non-immigrant visa. F-1 visas are issued to international students admitted to and attending accredited educational institutions in the U.S.

124.    As an F-1 non-immigrant, Doe's legal status in the U.S. is linked to his matriculation at the University. If he is no longer matriculating, he will no longer be in valid F-1 status. If he loses his F-1 status, he will be subject to removal, also known as deportation which results in Doe losing his employment, education, livelihood, and future in the U.S.

125.    According to USC's equal opportunity complaint processing procedures-EOP 1.01:

> "An individual (i.e., person, student, faculty, staff member or applicant) may file a complaint or seek information about illegal discrimination at the University of South Carolina based on race, color, religion, sex, gender, national origin, age, disability, sexual orientation, genetics or veteran status through the Office of Equal Opportunity Programs (hereinafter referred to as EOP office). Inquiries may be made by telephone, in person, in writing or by e-mail."

And about the factors that constitute a valid complain:

"In order to file a complaint, the complainant must be able to:

a. state a cause of action based upon one's membership in a protected class, race, color, religion, sex, gender, national origin, age, disability, sexual orientation, genetics or veteran status and the complaint must be;

b. timely, the date of the alleged violation(s) must have occurred within the past 180 days, and the complainant must be able to identify, with specificity, the dates of the alleged offense(s), and the complaint must be;

c. reduced to writing and signed before a notary public or EOP official, and;

d. must indicate some harm that the complainant has suffered, is suffering, or will suffer as a result of their protected class membership status, and;

e. specify the relief the complainant is seeking as a result of the complaint."

About the procedure of dismissal of a complaint:

"Dismissal of Complaints of Discrimination

a. A complaint may be dismissed if the designated official investigating the complaint determines that the complaint is without merit, or the accusations/charges are false.

b. A complaint may be dismissed if the designated official in the EOP office determines that the complainant has not cooperated and the action or actions of the complainant impairs or compromises the EOP office's ability to conduct an objective investigation. In such instances, where applicable, the EOP office will cease its' investigation, remove itself and

refer the complainant to the appropriate federal/state administrative agencies that are empowered to conduct investigations/resolution of illegal/prohibited discrimination.

    c. Willful false accusations by complainants or abuse of the EOP process may result in actions and sanctions, to include reprimand, suspension, demotion, or dismissal."

126.    According to USC's equal opportunity and affirmative action policy-EOP 1.00, "It is the policy of the University of South Carolina to recruit, hire, train, promote, tenure, and otherwise make educational and personnel decisions without regard to race, color, religion, sex, gender, national origin, age, disability, sexual orientation, genetics or veteran status, (except where sex, gender or age is a bona fide occupational qualification.)"

And about the responsibility of compliance of regulations at USC,

"The President, operating through the Office of Equal Opportunity Programs, and with the best efforts of all faculty, staff, and administrators, has overall responsibility for compliance with Federal and State laws and regulations governing affirmative action and equal opportunity."

127.    According to USC's Discriminatory Harassment policy,

"Discriminatory harassment includes conduct (oral, written, graphic, or physical) directed against any person or group of persons because of race, color, national origin, religion, sex, gender, age, disability, sexual orientation, genetics or veteran's status that has the purpose or reasonably foreseeable effect of creating an offensive, demeaning, intimidating, or hostile environment for that person or group of persons.

Such conduct includes, but is not limited to, objectionable epithets, demeaning

depictions or treatment, and threatened or actual abuse or harm."

128.    According to USC's relationship violence, stalking and harassment policy STAF 1.09,

"Threats of harassment via electronic devices to include but not be limited to e-mail,

Facebook, Twitter, blogs, phone, fax, or to suffer substantial emotional distress. The

relationship between the perpetrator and the victim may be a current or former partner

or spouse, dating relationship, acquaintance, or stranger."

And,

"Discrimination - is the unfair or unequal treatment of an individual or a group based

upon race, color, national origin, religion, sex, gender, age, disability,

sexual orientation, genetics, veteran status, or any other category protected by

law, that interferes with or limits the ability of an individual or group to participate in

or benefit from the services, activities, or privileges provided by the

University."

And,

"Victim's Bill of Rights

These rights include, but are not limited to, the following:

1. All students have the right to an environment free from physical assault,

emotional abuse, sexual intimidation, or any behaviors that interfere with students

attaining their educational goals.

2. In keeping with spirit of the State of South Carolina's Act 141: Victim and

Witness Services, victims of relationship violence who report their experience to

University officials can anticipate that University personnel will treat all incidents of relationship violence seriously.

3. Victims will be treated with dignity and respect.

4. Victims will be treated in a non-judgmental manner.

5. Campus organizations and services that can assist victims will be identified.

6. When a crime is reported to University officials, those officials will offer assistance in notifying proper authorities.

7. In a student judicial hearing, the University brings allegations against the accused, and the victim assumes the role of a witness to the allegations.

8. When a victim reports an incident of relationship violence and action is pursued against the alleged assailant, the incident will be investigated and adjudicated by appropriate criminal and/or University authorities.

9. Victims have the choice to have an advocate and/or advisor accompany them through University disciplinary proceedings.

10. A victim will be notified of the progress of the case, including initial contact with the alleged assailant and outcomes related to University discipline proceedings. Concerning these outcomes, the victim and charged student must respect the privacy rights of all involved.

11. University personnel will cooperate in obtaining, securing and maintaining evidence (including a medical examination), necessary in legal proceedings.

12. Victims will be informed of counseling services available.

13. Victims can request immediate on-campus housing relocation, transfer of

classes, or other steps to prevent unnecessary or unwanted contact or proximity to an

alleged assailant. When reasonably possible, requests will be accommodated."

And,

"The following employees on the Columbia campus are the University's responsible
employees for Title IX purposes:
President
Executive Vice President for Academic Affairs and Provost
Vice President for Student Affairs
Athletics Director
Deans
Department Chairs
Director of University Housing
Director of Student Conduct
Director of Equal Opportunity Programs
Director of Law Enforcement & Safety"

129.    The South Carolina Code of Laws (SC Code Ann, Sec. 16-3-1700) defines

harassment as a "pattern of intentional, substantial and unreasonable intrusion into the private

life of a targeted person that causes the person and would cause a reasonable person in their

position to suffer mental distress.

130.    The South Carolina Code of Laws (SC Code Sec. 16-3-1700) defines stalking as a

"pattern of words or conduct that is intended to cause, and does cause, a targeted person

and would cause a reasonable person in the targeted person's position to fear death of the

person or others important to that person, assault upon the person or others important to

that person, bodily injury to the person or others important to that person, criminal sexual

contact on the person or others important to that person, confinement of the person or

others important to that person, or damage to the property of the person or others important to that person."

131.    According to USC's sexual assault policy- STAF 1.08, sexual assault is defined as one or more of the following:

"1. Offensive Touching Sexual Assault - The touching of an unwilling or nonconsensual person's intimate parts (such as genitalia, groin, breast, buttocks, mouth, and/or clothing covering them); touching an unwilling person with one's own intimate parts; or forcing an unwilling person to touch another's intimate parts.

2. Non-consensual Sexual Assault - Unwilling or non-consensual penetration of any bodily opening with any objects or body part. This includes, but is not limited to penetration of a bodily opening without consent through the use of coercion.

3. Forced Sexual Assault - Unwilling or non-consensual penetration of any bodily opening with any object or body part that is committed either by force, threat, intimidation, or through exploitation of another's mental or physical condition of which the assailant was aware or should have been aware."

And, consent is defined as:

"Consent -To permit, approve or agree to comply or act. Consent must have the following elements:

a. Both individuals are physically free and capable to act.

b. Someone who is incapacitated cannot consent. Incapacity can result from any situation or condition that prevents a person from having the capacity to give consent,

including but not limited to the following: the use of

drugs or alcohol, when a person is asleep or unconscious, or because of an

intellectual or other disability).

c. Both individuals are fully conscious.

d. Consent can be withdrawn at any time.

e. Both are clear about their intent to engage in sexual activities and their desire to do

so is willing.

f. Silence or an absence of resistance does not in and of itself constitute consent.

g. Coercion, force or threat of either cancels consent.

h. Past consent of sexual activities does not imply ongoing future consent."

132.    According to USC's Student Code of Conduct, STAF 6.26, dishonesty and theft is
defined as:

"4. Dishonest or fraudulent behavior in any oral or written transaction with the university.

5. Dishonesty or misrepresenting the truth before a hearing of the University, or

furnishing false information or withholding information to any university official which

interferes with university processes or procedures."

133.    According to USC's student non-discrimination and non-harassment policy
STAF 6.24:

"Student Hearing Procedures

Decisions resulting from administrative hearings or a University conduct hearing may be

appealed by a student or a student organization to the Vice President for Student Affairs in

the following limited situations: (1) there was a procedural error committed in hearing the

case which significantly prejudiced the findings; or (2) new evidence, which could not have

been available at the time of the hearing and which is material to the outcome of the case,

becomes available. The procedure for appeal is fully described on the Office of Student

Conduct website at http://www.housing.sc.edu/osc/cp.html."

134.    On the website of USC's Carolina Judicial Council, this council was described as
people who:

"1. Act as a student voice to ensure fairness in the University Conduct System offer

students fair, unbiased, peer-led conduct hearings.

2. Enrich the student conduct sanctioning process by recognizing stumbling points as

learning and developmental opportunities"

135.    According to the Department of Education Question & Answer Letter to the Universities
on September 22nd, 2017:

"The Sanctions must be in a way that enforces the University Policy the best and consider

the effect of separating a student from her or his educational institution"

136.    In the U.S. Department of Education- Office of Civil Rights published on September 22,
2017:

"The Dear Colleague Letter and the question and answer has been withdrawn

1.  Schools are cautioned to avoid conflicts of interest and biases in the adjudicatory process
    and to prevent institutional interests from interfering with the impartiality of the
    adjudication

2.  Disciplinary sanction decisions must be made for the purpose of deciding how best to
    enforce the school's code of student conduct while considering the impact of separating a
    student from her or his education

3. Office of Civil Rights has previously informed schools that it is permissible to allow an appeal only for the responding party because he/she is the one who stands to suffer from any penalty imposed and should not be made to be tried twice for the same allegation."

137.    Fifth Amendment of the United States of America's Constitution:

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

138.    The Fifth Amendment also protects criminal defendants from having to testify if they may incriminate themselves through the testimony. A witness may "plead the Fifth" and not answer if the witness believes answering the question may be self-incriminatory. In the landmark *Miranda v. Arizona* ruling, the United States Supreme Court extended the Fifth Amendment protections to encompass any situation outside of the courtroom that involves the curtailment of personal freedom. 384 U.S. 436 (1966).

139.    Fourteenth Amendment of the United States of America's Constitution

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property,

without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws"

140.    According to 42 U.S.C. 1983:

"Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, Suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

II.  **Causes of action: Violation of Title IX, Violation of Fifth Amendment, Violation of Fourteenth Amendment, Violation of Due Process, Double Jeopardy, Negligence, Breach of Contract, Intentional Infliction of Emotional Distress**

141.    According to Carolinian Creed:

"The community of scholars at the University of South Carolina is dedicated to personal and academic excellence. Choosing to join the community obligates each member to the Carolinian Creed. Academic dialogue and civil discourse are the cornerstone of the educational system and crucial to individual growth. Students are encouraged to practice personal and academic integrity, respect the rights and dignity of all persons, respect the

rights and property of others, discourage bigotry, while striving to learn from differences in people, ideas, and opinions, and demonstrate concern for others, their feelings, and their need for conditions which support their work and development"

142.     Defendant Wells modified Jane Roe's complaint on August 23, 2017 at 11:17:18 am although it was initially submitted on August 22, 2017 at 10:31:32 pm.

143.     According to USC's equal opportunity complaint processing procedures-EOP 1.01:

> "An individual (i.e., person, student, faculty, staff member or applicant) may file a complaint or seek information about illegal discrimination at the University of South Carolina based on race, color, religion, sex, gender, national origin, age, disability, sexual orientation, genetics or veteran status through the Office of Equal Opportunity Programs (hereinafter referred to as EOP office). Inquiries may be made by telephone, in person, in writing or by e-mail."

And about the factors that constitute a valid complain:

> "In order to file a complaint, the complainant must be able to:
>
> a. state a cause of action based upon one's membership in a protected class, race, color, religion, sex, gender, national origin, age, disability, sexual orientation, genetics or veteran status and the complaint must be;
>
> b. timely, the date of the alleged violation(s) must have occurred within the past 180 days, and the complainant must be able to identify, with specificity, the dates of the alleged offense(s), and the complaint must be;
>
> c. reduced to writing and signed before a notary public or EOP official, and;
>
> d. must indicate some harm that the complainant has suffered, is suffering, or will

suffer as a result of their protected class membership status, and;

e. specify the relief the complainant is seeking as a result of the complaint."

About the procedure of dismissal of a complaint:

"Dismissal of Complaints of Discrimination

a. A complaint may be dismissed if the designated official investigating the complaint determines that the complaint is without merit, or the accusations/charges are false.

b. A complaint may be dismissed if the designated official in the EOP office determines that the complainant has not cooperated and the action or actions of the complainant impairs or compromises the EOP office's ability to conduct an objective investigation. In such instances, where applicable, the EOP office will cease its' investigation, remove itself and

refer the complainant to the appropriate federal/state administrative agencies that are empowered to conduct investigations/resolution of illegal/prohibited discrimination.

c. Willful false accusations by complainants or abuse of the EOP process may result in actions and sanctions, to include reprimand, suspension, demotion, or dismissal."

144.    Nowhere in the USC-Complaint Processing Procedure Policy provides for the modification of the complaints by the Title IX coordinator.

145.    Defendant Wells failed to address or provide reasoning for modifying the complaint which was originally submitted one day before the modification happened.

146.    When Plaintiff filed a complaint of harassment against Jane Roe and expressed the tremendous amount of stress and anxiety he was experiencing as a result of false allegations

of Jane Roe in her second complaint, Defendant Wells dismissed his complaint without any rationale or any legitimate reason.

147.    Plaintiff was a USC student at the time of filing a complaint and he had legitimate reason for filing a complaint against Jane Roe and his complaint should not have been dismissed by Defendant Wells.

148.    According to EOP 1.01, a complaint can be dismissed if it is without merit, or the accusations/charges are false. Considering Roe falsely accused Plaintiff of seeking her medical records and stalking her on Main Street, Plaintiff's complaint was not without complaint and should not have been dismissed.

149.    According to EOP 1.01, willful false accusations by complainants or abuse of the EOP process may result in actions and sanctions, to include reprimand, suspension, demotion, or dismissal. Considering Jane Roe's second complaint was proved to be without merit and was willfully false, Defendant Wells failed to take actions in order to discipline Jane Roe.

150.    According to USC Policy regarding appeals process, each party has 5 business days to appeal the decision of the Carolina Judicial Council.

151.    Defendant Liggett is responsible for accepting and reviewing appeals from each parties.

152.    Defendant Pruitt reviews the appeals before sending them to the Title IX Appellate Review Committee.

153.    Jane Roe's appeal has been filed untimely and after the deadline which should not have been admitted by Defendants Liggett and Pruitt.

154.    Defendant Liggett and Defendant Pruitt violated Plaintiff's due process by accepting Roe's appeal which was filed too late.

155.    Title IX Appellate Review Committee considered Plaintiff's sanction a procedural error but according to the USC policy, a procedural error must significantly prejudice the "findings" of the hearing.

156.    Defendant Liggett and Defendant Pruitt are responsible for admission of the late appeal and the decision made by Title IX Appellate Review Committee.

157.    Defendant Liggett and Defendant Pruitt have been negligent in handling Plaintiff's Title IX case.

158.    Defendant Liggett and Defendant Pruitt have violated Plaintiff's constitutional Fourteenth Amendment right to due process and Fifth Amendment rights regarding Double Jeopardy by admitting Roe's Appeal which was filed too late and trying Plaintiff twice for the same charges.

159.    Defendant Liggett and Defendant Pruitt have breached Plaintiff's contract with USC by violating his appellate rights.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Plaintiff John Doe demands

judgment against Defendants as follows:

(i) An injunction enjoining Defendant's from enforcing USC's suspension and other

sanctions on Plaintiff;

(ii) An injunction enjoining Defendant's from revoking Plaintiff's visa status and

notifying SEVIS and ICE and Department of Homeland Security;

(iii) An injunction enjoining Defendant's to re-enroll Plaintiff at USC and give him his job back;

(iv) A judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v) awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

**JURY DEMAND**

John Doe herein demands a trial by jury of all triable issues in the present matter.

Dated:

01 – 19 – 2018